

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*500 Pearl Street*
*New York, New York 10007*

January 22, 2021

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Sahil Patel*, 14 Cr. 158 (AKH)

Dear Judge Hellerstein:

The Government respectfully submits this letter opposing defendant Sahil Patel's motion for compassionate release. (Dkt. 93.) Patel seeks compassionate release on the basis of a fear of contracting COVID-19, while simultaneously declaring that he does *not* have such a fear insofar as he believes that he has already contracted the disease asymptomatically, but instead fears unspecified "post-COVID" complications. *See* Pet. at 3 ("Petitioner is no longer afraid of contracting COVID 19 as he already has asymptomatically, however he fears now the post COVID related consequences."). Patel has failed to articulate any extraordinary and compelling basis for relief under 18 U.S.C. § 3582 and, in any event, the § 3553(a) factors counsel against his early release. His motion should be denied.

I.   **Background**

From at least December 2011 through the day of his arrest on December 18, 2013, Sahil Patel participated as a leader in a sophisticated scheme to intimidate and defraud hundreds of innocent victims of hundreds of dollars apiece. (*See* PSR ¶¶ 11-13, 22-23). Telephone call centers located abroad (in this case, India) hire English-speaking employees to place telephone calls to individuals living in the United States. (*See United States* v. *Patel*, S1 14 Cr. 158 (AKH), Indictment at ¶ 4(a); PSR ¶¶ 11, 17(b)). Armed with long lists of potential victims, referred to by Patel and his co-conspirators as "lead sheets," those India-based callers would systematically place thousands of calls to the United States in the hopes of intimidating the call recipient into providing a payment to the co-conspirators. (PSR ¶¶ 17(b), 18(a)). Patel himself participated in obtaining, receiving, and forwarding such "lead sheets," which contain the personal identifying information of hundreds of such victims – the identities that formed the basis for the aggravated identity theft charge in Count Four of the Indictment to which Patel admitted his guilt. (PSR ¶ 17(b) (referring to "telemarketing" or "debt collection" agencies in India with which Patel was associated)).

In order to extort these victims, the callers impersonated law enforcement officials and threatened their victims with financial penalties and arrest in connection with fabricated financial

crimes. For example, in August 2012, a victim of the fraud ring received several calls from an individual who pretended to be a particular Special Agent of the FBI (the name chosen for this impersonation was the name of an actual Special Agent of the FBI based in New York). (PSR ¶ 11). The caller, in the guise of law enforcement, threatened this victim with imminent arrest unless the victim paid approximately $583 to the fraud ring. (PSR ¶ 10). This victim, like so many others, was susceptible to the ring's threats and decided to provide the payment demanded. At that point, Patel took over the receipt and laundering of those extorted proceeds.

In order to receive funds in a manner that would mask his identity, Patel and the fraud ring undertook several measures to anonymize itself. First, the callers in India used a service called "Magic Jack" in order to place calls to their victims. This service allows anyone at any location in the world to place telephone calls over an internet connection; recipients of the call, however, will see a normal telephone number, chosen by the Magic Jack subscriber, appear on their caller ID. (PSR ¶ 14). The ring went further than this, however, and subscribed to their Magic Jack accounts under fraudulent names (including the name of the FBI Special Agent described above) and using addresses that would, if discovered by their victims, appear to be that of certain United States law enforcement agencies. For example, the calls placed to the victim described above were from a number subscribed to a person who provided as his or her contact address the physical address for the United States Attorney's Office for the Southern District of New York. (PSR ¶ 14(c)). Another Magic Jack account associated with Patel's fraud ring used the physical address of the FBI's New York offices. (PSR ¶ 14(d)).

Second, Patel and his co-conspirators used several layers of wire transactions in order to conceal the destination and nature of these extorted payments. Initially, the ring instructed victims to make their payments in the form of "Money Paks." (*See* PSR ¶ 12). Money Paks are financial instruments widely available at retail outlets such as pharmacies and convenience stores. A person provides the retailer with cash in exchange for a code. Using that code, the individual can place funds on a debit card in his or her possession, or, as was the case here, in the possession of Patel and his underlings. Upon obtaining a Money Pak code, the victim would be instructed to call back the "law enforcement officer" (*i.e.*, the extortionist) and provide the code from the Money Pak. Using that code, Patel and his underlings would then place funds on debit cards and subsequently withdraw those funds in the form of cash. Patel would collect that cash, purchase money orders, and wire funds back to his co-conspirators in India. (*See* PSR ¶¶ 12, 16-20).

Third, in order to mask his own identity and to shift the risk of apprehension to others, Patel recruited other individuals – often unwitting, younger underlings, as Patel himself acknowledged – to apply for the debits cards onto which extorted funds were uploaded. (PSR ¶¶ 16-18, 22). Patel targeted the young, the financially stressed, and the naïve to act as his money laundering tools. One series of messages exchanged on or about April 4, 2013, found on Patel's email account and exchanged between Patel ("SaAhiL") and another co-conspirator makes clear this strategic decision on Patel's part:

>   SaAhiL:   Yea. . . takes lotta tym n patiences[1]

---

[1] All errors in grammar and spelling are as they appear in the original exchange of messages, copies of which were provided in connection with Patel's sentencing.

> jatin cc chiki: I know how it can b
>
> jatin cc chiki: To manage and train so many people b stuff
>
> SaAhiL: N if find dumb ppl [people] . . . bfr they evn figure it out! I get rid of them
>
> SaAHhil: With 10k in their pockets . . . they never complain.
>
> jatin cc chiki: Wht more they need
>
> jatin cc chiki: Much much better than the jobs they do
>
> **SaAhiL: They treat my lyk god**
>
> jatin cc chiki: They even should
>
> SaAhiL: N i take full advan[tage]

On the same day, Patel further clarified his views on the best recruits to involve in his fraud (women, whom he disdained) and the profitability of his scheme:

> SaAhiL: In my case, i choose d ladies
>
> SaAhiL: Easy to communicate n even easier to talk them into
>
> SaAhiL: I flash $$ n they come runnin
>
> …
>
> SaAhiL: I ve got 3 ppl with total 9 merchants[2] n team of 12 ppl n their teams applyin min 40 cards a day

In this conversation, Patel expressed his view that women were desirable recruits for the fraud ring precisely because of his misogynistic view that they are especially naïve and desperate for money. Moreover, Patel confirmed in this conversation that he managed a large group of such recruits, 36 people in total working in three separate teams. Among these recruits, and among the women that Patel disdains, was his own sister. Daily reports sent to Patel reflected thousands of dollars per worker per day (*see* PSR ¶ 63), exactly as Patel himself admitted in his electronic conversations quoted above, including one such conversation in which Patel asserted that he and his teams processed "over 50k a day." (*See* PSR ¶ 23; A. 81).

---

[2] In the context of this fraud, "merchants" refers to individual with bank accounts through which funds derived from the fraud were laundered.

The Probation Office prepared Patel's PSR on April 22, 2015. The PSR calculated Patel's combined Guidelines offense level for Counts One through Three. That calculation began with a base offense level of 7, and then added 16 offense levels based on the 2014 version of the Guidelines' enhancement, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), for a relevant loss amount of more than $1,000,000, but less than $2,500,000. (PSR ¶ 31). The PSR then included a further enhancement of six offense levels for offenses involving more than 250 victims (PSR ¶ 32), and a further four-point enhancement based on Patel's role as an organizer or leader of criminal activity involving five or more participants. (PSR ¶ 36). With Patel in Criminal History Category I, the PSR correctly calculated Patel's Guidelines to be 151 to 188 months' imprisonment on Counts One through Three (as grouped) and a consecutive term of imprisonment of 24 months for Count Four.

After multiple submissions and the prospect of a *Fatico* hearing, Patel proceeded to sentencing, at which the Court analyzed Patel's conduct in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), and ultimately ruled that the Guidelines reasonably and correctly addressed the seriousness of Patel's offense, and imposed a sentence at the bottom of Patel's uncontested Guidelines range.

## II. Patel's Compassionate Release Motion

On or about January 4, 2021, Patel moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Patel's argument is that he should released under that provision in light of risks posed to Patel by COVID-19. The Government does not dispute that Patel has complied with the administrative exhaustion requirement of § 3582.

### A. Applicable Law

Under 18 U.S.C. § 3582(c), the Court "may not" modify a term of imprisonment once imposed, except under certain limited circumstances. One such circumstance is the "compassionate release" provision, which provides that a district court "may reduce the term of imprisonment" where, after considering the movant's claims and the factors set forth in 18 U.S.C. § 3553(a), it finds "extraordinary and compelling reasons warrant such a reduction." *Id.* § 3582(c)(1)(A)(i). A motion under this provision can be made by the BOP or by the defendant himself, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

Patel bears of the burden of proving that he is entitled to relief under 18 U.S.C. § 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."). And because Rodriguez filed his motion *pro se*, it should be construed liberally, and interpreted to raise the strongest arguments that it suggests. *E.g. Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

### B. Patel Has Not Established Extraordinary and Compelling Reasons for a Sentence Reduction

The Court can readily reject Patel's argument that COVID-19 is a reason for his early release. Patel admittedly has no fear of infection in itself, but complains of unspecified "post COVID" potential complications that may arise. Notably, none of the medical issues listed in Patel's submission are of a type that place him at risk of severe illness from COVID-19. *See* People with Certain Medical Conditions, CDC, July 17, 2020, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Patel is in the broad category of inmates for whom COVID-19 is of concern but not of particular or extraordinary threat. He has not carried his burden of demonstrating extraordinary or compelling circumstances warranting a revision of his sentence.

### C. The 3553(a) Factors Weigh Against Release

Even if the defendant had established an "extraordinary and compelling reason" for release, the Court should still deny the petition in light of the sentencing factors set forth in 18 U.S.C. § 3553(a). Those considerations weigh against granting the motion. In particular, the nature and circumstances of the offense, as well as the seriousness of the offense and the need to provide just punishment, *see* 18 U.S.C. § 3553(a)(1) & (2), clearly warrant a lengthy custodial sentence, as Patel received. Patel was an exploitative and prolific manager of an extremely lucrative criminal enterprise, as recounted in more detail above.

Moreover, Patel's history and relevant personal characteristics, as well as consideration of specific deterrence and the need to protect the public, each weigh against Patel's petition. As his PSR makes clear, Patel's lack of concern or regard for the naïve and financially distressed people recruited into his ring, his misogynistic views that drove his particular recruitment tactics, and his callous exploitation of his victims' fears reflected not only the heinousness of Patel's offense but the moral default at his core. As the Court is aware, Patel's approach to his sentencing involved multiple attempts to falsely portray himself as somehow unaware of certain aspects of the crime he committed, further reflecting not only his devotion to that fraud but a lack of remorse.

In short, even if Patel were being re-sentenced today, the 3553(a) factors, consistent with the applicable Guidelines Range, would support imposing the same sentence the Court imposed at his original sentencing.

**III. Conclusion**

      There is nothing extraordinary or compelling presented in Patel's petition, and his criminal offenses warrant the sentence that the Court imposed. For the foregoing reasons, Patel's motion should be denied.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: /s/ Andrew C. Adams
     Andrew C. Adams
     Assistant United States Attorney
     (212)637-2340

cc:    Sahil Patel (by mail)

[Type text]

## **CERTIFICATE OF SERVICE**

      I, Andrew C. Adams, Assistant United States Attorney for the Southern District of New York, hereby certify that on January 22, 2021, I caused a copy of the foregoing Government's Opposition to be served by ECF and U.S. Mail upon the following:

      Sahil Patel
      BOP Reg. No. 71079-066
      555 GEO DRIVE
      PHILIPSBURG, PA  16866

Dated:   New York, New York
             January 22, 2021

      ___/s/_____
      Andrew C. Adams
      Assistant United States Attorney
      Southern District of New York
      (212) 637-2340